SCOTT L. FROST, ESQ., CA Bar No. 258063
scott@frostlawfirm.com
ANDREW SEITZ, ESQ., CA Bar No. 273165
andrew@frostlawfirm.com
PAUL C. COOK, ESQ., CA Bar No. 170901
paul@frostlawfirm.com
**FROST LAW FIRM, PC**
273 West 7th Street
San Pedro, CA 90731
Tel.: (866) FLF-MESO
Fax: (833) FLF-MESO

and

JOHN M. CARON, ESQ., CA Bar No. 130633
**THE LAW OFFICES OF WORTHINGTON & CARON, PC**
273 W. 7th Street
San Pedro, CA 90731
Tel.:(310) 221-8090
Fax: (310) 221-8095

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GRANT COCHRAN,** *individually and as successor-in-interest to Decedent DEFORD COCHRAN***, and CHARLENE COCHRAN, BRENT COCHRAN, CHRISTOPHER COCHRAN, DANIEL COCHRAN, EVAN COCHRAN, FLYNN COCHRAN,** and **HEATHER RODRIGUEZ,** *individually*, <br><br> Plaintiff, <br><br> vs. <br><br> **AIR & LIQUID SYSTEMS** | Case No. 2:21-cv-09612-MEMF-PD <br><br><br> **PLAINTIFFS' EXPERT DISCLOSURES PURSUANT TO F.R.C.P. RULE 26** |

**CORPORATION** (*sued individually and as successor-in-interest to* BUFFALO PUMPS, INC.), et al.

Defendants.

## PLAINTIFFS' RULE 26(a)(2)(B) EXPERT DISCLOSURES

Plaintiffs disclose the attached expert reports listed below in the above captioned matter pursuant to Federal Rule 26(a)(2)(B). The materials include copies of reports, CVs, lists of trials and depositions, and fee schedules.

Pursuant to Federal Rule 26(e), Plaintiffs will supplement this disclosure to the extent necessary and in the event additional information is obtained during the pendency of:

1.    Arnold P. Moore, PE

Arnold P. Moore, 395 Canterbury Lake, Alpharetta, GA 30004. Mr. Moore has agreed to testify if necessary, at trial and will be sufficiently familiar with the case to provide a meaningful oral deposition. Mr. Moore's fee for deposition testimony is $350.00 per hour with a one-hour minimum.

Mr. Moore is a graduate of the U.S. Naval Academy (1968).  From 1968 to 1972 he served at sea in the U.S. Navy.  He attended the Navy's ship design and construction curriculum at the Massachusetts Institute of Technology and achieved a master's degree in naval architecture and marine engineering (1975).  He has the professional degree of ocean engineer.  After graduating from MIT he served again in the Navy.

He is a life fellow of SNAME and has been a member since 1980 where he served in the Gulf section officer positions, including chair, and served at the national level as a regional vice president, on the design technical and research committee and on the awards committee.  He is a registered professional engineer and a member of the American Society of Naval Engineers.

He worked for over 24 years at Northrop Grumman Ship Systems sector where he recently retired from the position of engineering vice president.  He received the 2005

William M. Kennedy Award from the Society of Naval Architects and Marine Engineers (SNAME).  At Northrop Grumman Ship Systems, he held positions in the detail design of the Ticonderoga-class cruisers, the Wasp and San Antonio classes of amphibious assault ships, the Israeli Navy SA'AR 5 corvette, the Arleigh Burke class destroyer and the Coast Guard's national security cutter.

Through Mr. Moore's experience, education and management positions in the shipbuilding industry, he is familiar with plans, designs, and specifications used in the construction and repair of commercial and Navy vessels and maritime ships, as well as the actual planning, design, construction, repair, and operation of these vessels.  He is knowledgeable regarding the asbestos-containing products used in the construction and repair of Navy, commercial, and maritime ships.  He is familiar with Navy and maritime manuals, specifications, qualified products lists, departure reports, deck logs, and other documents routinely used in the design, construction, repair, and operation of Navy, maritime, and other ships.  He is knowledgeable concerning all of the equipment and machinery comprising the steam propulsion plants on Navy, commercial, and maritime ships, including the methods and materials used to insulate such equipment.  He is also knowledgeable concerning the operation and maintenance of this equipment, including the extent to which asbestos-containing materials would be disturbed, removed and replaced during regular operation and maintenance.  He is also familiar with historical documents, records and correspondence that are applicable to the construction of maritime, commercial, and Navy ships and the shipyards that built and repaired those ships.

Mr. Moore will offer testimony identifying the manufacturers of the equipment comprising the propulsion plants on ships, including but not limited to, the manufacturers of main turbines, engines, boilers, auxiliary turbines, forced draft blowers, distilling plants, air ejectors, deaerating feed tanks, and pumps, all of which were insulated with significant amounts of asbestos-insulation materials.  He will also identify the equipment that was sold with asbestos-containing gaskets and packing as component parts.  Mr.

Moore will testify that the suppliers of this equipment were well aware of the equipment's intended use and service and that the equipment could not be safely and properly operated unless insulated with asbestos.  Mr. Moore will testify that the US Navy and maritime neither required nor prohibited equipment manufacturers or suppliers from placing warnings regarding any known or foreseeable dangers resulting from the normal and intended installation, use, maintenance and repair of the equipment either on the equipment itself, or in the technical or service manuals provided to the US Navy and maritime by these equipment manufacturers.  Mr. Moore will testify that during the construction and maintenance of ships, DeFord Cochran would have been exposed to the asbestos-containing products and insulation associated with this equipment, including the internal asbestos gaskets and packing provided and/or specified by the manufacturer.

Mr. Moore will also testify that all equipment manufacturers were required to provide instruction books that detailed the operating pressures and temperatures and also included instructions as to the proper and safe operation of the equipment.  He will also state that according to recognized warning practice, the defendants could have placed a warning on both the product and its containers, as well as taken other steps to alert DeFord Cochran as to the hazards of asbestos including but not limited to brochures, training manuals and posters.

Mr. Moore will also offer opinions and testimony in this case on any other relevant aspect of DeFord Cochran's service and work on or in the vicinity of the navy vessel, maritime ship, and the shipyards identified in discovery in this case, including DeFord Cochran's asbestos exposure incurred during his work on or near these ships, or in the shipyards.

Mr. Moore may testify as to U.S. Naval and maritime vessel construction, overhaul, repair and maintenance.  Mr. Moore is familiar with Navy and maritime manuals and specifications for construction and overhaul and repair of U.S. Navy and maritime vessels.  He is knowledgeable of and may testify to the use of asbestos-containing materials on board ship, work practices regarding the use of insulation and other asbestos-

containing products and the types of asbestos products required by various Navy, maritime, and manufacturer specifications and manuals, as well as work performed in naval shipyards. He is familiar with and may testify concerning Navy, maritime, and military specifications for the types and quantities of materials used in naval construction and repair including insulation, gaskets and packing materials.

Mr. Moore is familiar with types of equipment employed on naval and merchant vessels and maritime ships for their operation. He is familiar with and may testify concerning Navy, maritime, and manufacturer specifications for the types and quantities of materials used in naval construction and repair including insulation materials and asbestos-containing materials found on and in naval and maritime equipment. He also may testify as to the specifications including the types and grades, the Navy and maritime testing procedures and test results related to the approval of products to be used on naval vessels and maritime ships.

Mr. Moore is expected to offer testimony regarding U.S. Navy and maritime ship design and engineering, particularly with regard to the use of asbestos-containing insulation, gaskets and packing, aboard ship and in various applications in marine engineering operations, including without limitation, boilers, turbines, valves, pumps, steam lines, insulation, and auxiliary systems and equipment. Mr. Moore may also testify as to the authenticity and meaning of records, specifications, and other documents pertaining to naval ship construction and operation. He may offer the opinion that Navy and maritime inspection reports, Navy Bureau of Ships documents and other similar records are reliable and authoritative sources of information for establishing the manufacturers of various pieces of equipment aboard a particular U.S. Navy and maritime vessel or class of vessels. Mr. Moore may also provide general testimony concerning the field of marine engineering and machinery in general as it relates to the subject of the manufacture, design, construction, maintenance, and overhaul of U.S. Navy, maritime and commercial vessels, shipyard operations, including major ship construction and overhaul, as well as the use of asbestos and asbestos containing materials during such

activities.   In addition, Mr. Moore may also offer testimony concerning the level of supervision and control exercised by the U.S. Navy and maritime over the design and manufacture of equipment intended for installation on U.S. Navy and maritime vessels.

Mr. Moore may also testify regarding the construction and operation of the United States Navy and maritime ships, particularly during the time period when DeFord Cochran was potentially exposed to asbestos while serving and/or working aboard such vessels.   Mr. Moore may also testify regarding DeFord Cochran's Naval and maritime service record and the classification, function, purpose and service records of ships identified by DeFord Cochran.

Mr. Moore may also testify as to the methods, manner and procedures for maintaining and repairing the propulsion plant, boilers, turbines, pumps, valves and other associated and auxiliary equipment aboard Naval vessels and maritime ships, including during shipyard periods as testified to by DeFord Cochran.   Mr. Moore may testify about DeFord Cochran's actual and potential exposure to asbestos in the Navy and aboard various ships, both military and commercial.   He may also testify regarding DeFord Cochran's asbestos exposure to products and equipment attributable to the defendants named in this case.

Mr. Moore also may testify as to the specifications, including the types and grades, of which insulation, gasket and packing materials were used on naval vessels and maritime ships. Mr. Moore may testify regarding departure reports and ship histories regarding specific ships.

Mr. Moore may testify based on hypotheticals propounded by counsel. Such hypotheticals may include, but are not limited to, factual summaries related to specific exposures for which there is evidence in the case.

Attached as Exhibit A, is the signed report of Mr. Moore, his curriculum vitae, and a list of other cases that Mr. Moore has testified as an expert at trial or deposition in the last four years.

2.   Dr. David Zhang

David Zhang, M.D, Ph.D., MPH, FCAP, 214-10 25th Ave., Bayside, NY 11360. Dr. Zhang is a pathologist. Dr. Zhang has agreed to testify at trial; Dr. Zhang is or will be sufficiently familiar with the case to provide a meaningful oral deposition. Dr. Zhang's fee for deposition testimony is $650.00 per hour.

Dr. Zhang may testify, live or by deposition concerning his review of the medical records, pathology and work history of Plaintiff and Plaintiff's diagnosis of asbestos-related disease in this case. Dr. Zhang may testify concerning the role of immunohistochemistry in conclusively diagnosing a malignant disease. Additionally, Dr. Zhang may testify that Plaintiff 's asbestos-related disease was caused by Plaintiff's exposure to defendants' asbestos-containing products. Further, Dr. Zhang may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer. Dr. Zhang may testify that all exposures above background are substantial contributing factors to an individual's disease, that all asbestos fiber types cause all types of asbestos-related diseases and that asbestos-related diseases are latent diseases. He will testify concerning all types of cancer risks from asbestos exposure.

Additionally, Dr. Zhang will testify about asbestos and the diseases caused by asbestos generally. He will testify that smoking is addictive. Dr. Zhang may testify that, based on epidemiological studies, Plaintiff's asbestos-related disease was caused by Plaintiff's exposure to asbestos-containing products. Additionally, Dr. Zhang may testify that, based on the medical and scientific literature available to defendants, defendants knew or should have known that their asbestos-containing products could cause disease. He may testify as to his review of the literature. Dr. Zhang may further testify regarding exposure level of asbestos and what levels of asbestos may cause disease, and as to when this was known in the medical and scientific literature.

Dr. Zhang may also testify as to the hazardous nature of asbestos and that asbestos-containing products are unreasonably dangerous due to their propensity to cause asbestos-related diseases. Dr. Zhang may testify concerning the increased risk of cancer faced by

asbestos-exposed workers and the epidemiological link between asbestos and cancer. Dr. Zhang may also testify concerning fiber types of asbestos generally and that all types of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers. This doctor may testify that, based on a review of published information and unpublished data concerning the defendants' products, these products produce dangerous levels of asbestos dust, which contributed to cause Plaintiff's disease.

Dr. Zhang may testify that Chrysotile in asbestos-containing products is contaminated with Tremolite asbestos. Dr. Zhang may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma. Dr. Zhang may also testify that chrysotile in asbestos-containing products may be contaminated with tremolite asbestos.

He will also state that according to recognized warning practice, the defendants could have placed a warning on both the product and its containers, as well as taken other steps to alert DeFord Cochran as to the hazards of asbestos including but not limited to brochures, training manuals and posters. For those defendants who allegedly placed a label on the product and/or the container or sent out brochures and other literature, he will evaluate those using commonly accepted warning principles. He will testify that the prior OSHA label (i.e. 1972) was inadequate and was contrary to NIOSH's position and was inconsistent with other OSHA labels for substances which he understands pose a lesser health risk.

For those defendants whose products or activities involved the use of asbestos or the removal of asbestos and/or asbestos containing products, he will offer the opinion that an adequate warning should have been given relating to danger which results from the use of the defendant's product or an activity would result in exposure to asbestos even if the asbestos was not provided by the defendant.

For those defendants who are responsible for DeFord Cochran's exposure to asbestos, from either the workplace, home or the general environment, he will testify that the defendants did not follow proper and necessary warning steps to eliminate and/or

PLAINTIFFS' EXPERT DISLCOSURES PURSUANT TO FRCP RULE 26

minimize DeFord Cochran's asbestos exposure.

Dr. Zhang may also testify as to the state of the medical and scientific art concerning asbestos-related diseases at relevant times, including that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames.

Dr. Zhang may testify that warnings placed on containers of asbestos-containing products, if any, may have been inadequate to properly inform users and person exposed of the significant hazards of asbestos inhalation.

Further, Dr. Zhang will testify as to the following specific issues: his background; ethical aspects of hazard communication; warnings; and the state of the art of the medical and scientific literature regarding asbestos. Dr. Zhang will testify regarding bystander exposure to asbestos, "fiber drift", the fact that asbestos products are "toxic" and unreasonably dangerous, TLV's and PEL's, and the concept that each identified exposure was a proximate and substantial factor in causing DeFord Cochran's asbestos-related disease. Further, Dr. Brodkin may testify as to the degree of asbestos exposure DeFord Cochran would have received during his employment. He may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos.

Dr. Zhang may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases; the historical aspects of the development of OSHA/NIOSH and the history of OSHA/NIOSH regulations and other governmental regulations regarding asbestos and asbestos exposure. Dr. Zhang may also testify that Defendants' failure to comply with these regulations resulted in asbestos exposures leading to DeFord Cochran's injuries.

Dr. Zhang may testify based on hypotheticals propounded by counsel. Such hypotheticals may include, but are not limited to, factual summaries related to specific

exposures for which there is evidence in the case.

Dr. Zhang's opinions will be based upon his review of any and all medical records and available chest x rays and/or pathology materials, as well as his expertise in the field, including experience and training, and his review of historical and more recent medical articles and journals, including his own book, "An Outline of Asbestos-Related Health Effects."

Dr. Zhang may testify that Plaintiff developed mesothelioma as a result of exposure to asbestos. Additionally, Dr. Zhang may testify that Plaintiff's asbestos-related disease was caused by Plaintiff's exposure to Defendants' asbestos-containing products. Dr. Zhang may also testify that Plaintiff's diagnosis and symptoms were related to, and caused by, Plaintiff's exposure to asbestos and that all exposures to asbestos above background substantially contribute to the development of mesothelioma. He may testify that the effects of exposure to asbestos at occupational levels are cumulative in nature. Occupational levels of asbestos exposure are typically many times (tens to hundreds or a thousand fold and greater) above background levels experienced by those with no exposure to asbestos at occupational levels. Dr. Zhang may also testify that individuals can be exposed to asbestos outside of the workplace or in a bystander and/or household fashion, but still experience exposure at levels one would expect to see occupationally or directly. These exposures contribute to the development of asbestos diseases and particularly mesothelioma. Further, Dr. Zhang may testify concerning the increased risk of cancer faced by asbestos-exposed persons and the epidemiological link between asbestos and cancer. More specifically, Dr. Zhang may testify as to Plaintiff's increased risk of developing an asbestos-related cancer during Plaintiff's lifetime as a result of Plaintiff's exposure to Defendants' asbestos-containing products. Dr. Zhang may testify as to the hazardous nature of asbestos and/or asbestos-containing products and as a result, that such asbestos and/or asbestos-containing products are unreasonably dangerous. Dr. Zhang may testify concerning the reasonable and necessary medical expenses that

Plaintiff incurred and/or will incur in the future as a result of Plaintiff's asbestos-related disease.

Dr. Zhang will testify as to the procedures and treatments experienced by Plaintiff and Plaintiff's pain and suffering attributable to the disease mesothelioma. He may further testify as to facts and circumstances regarding the nature of the injuries and damages experienced by mesothelioma victims. Dr. Zhang testify regarding Plaintiff's prognosis and life expectancy had Plaintiff not been diagnosed with mesothelioma.

Further, Dr. Zhang may testify concerning the increased risk of cancer faced by asbestos-exposed persons and the epidemiological link between asbestos and cancer. More specifically, Dr. Zhang may testify as to Plaintiff's increased risk of developing an asbestos-related cancer as a result of Plaintiff's exposure to Defendants' asbestos-containing products. Dr. Zhang may testify as to what caused and/or contributed to Plaintiff's exposure to Defendants' asbestos-containing products. Dr. Zhang may testify concerning fiber types of asbestos generally and that all types of asbestos fibers and all lengths of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers. Dr. Zhang may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos. He may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. Dr. Zhang may testify regarding when it was known that bystander and household exposures were known to cause disease.

This expert may also testify concerning asbestos reintrainment that occurs, the studies of the amount of asbestos fibers released into the breathing zone during ordinary and foreseeable operations of asbestos products. He may testify that during foreseeable uses of Defendants' asbestos products that those products released asbestos fibers into the breathing zone of workers, including but not limited to, DeFord Cochran, in levels that are above background. These asbestos products include dry powders that are mixed with water and sanded, pre-mixed pastes that are sanded, thermal insulation products that are

cut, sawed and/or torn out, adhered gaskets that are removed in whole or in part by brushing or sanding, boards or flat sheets or tiles or siding that are cut or scored or abraded, brake linings that are ground, filed or sanded and/or blown out of drums with supplied air, and products scrap that is swept or blown or vacuumed or ripped out. He may testify that impregnated and/or encapsulated products, when disturbed or abraded, can release asbestos fibers into the breathing zone of workers, like DeFord Cochran, in levels that are above background. He may compare and contrast the findings with other scientific findings. He may offer opinions concerning testing which has been performed on behalf of Defendants or the lack of testing on Defendants' products.

This expert may testify that dust levels measured in testing one Defendants' asbestos product would be similar to the results from another Defendant's similar product with similar ingredients.

It is anticipated, that these experts will testify that asbestos exposure of DeFord Cochran arising from Defendants' asbestos products or activities involving the use of asbestos or asbestos products were substantial contributing factors in DeFord Cochran's overall asbestos exposure and were the result of Defendant's failure to exercise appropriate industrial hygiene controls for suppressing or reducing exposures to asbestos, including but not limited to adequately warning DeFord Cochran of the dangers associated with asbestos and means to protect himself. He will testify that these failures by Defendants were knowing and/or unreasonable in the time and place in which they occurred given the information that was available to Defendants, medical and scientific literature, statutes, regulations and/or based on the Defendant's actual knowledge. This expert's opinions may be based upon their review of any and all records and materials, published and or expressed opinions of other experts in the field, corporate documents, as well as their expertise in the field, including experience and training, and their review of historical and more recent scientific articles and journals as well as government regulations.

Dr. Zhang may testify regarding the development of knowledge in the medical and

scientific community regarding asbestos and asbestos diseases.

Dr. Zhang's opinions will be based upon his review of any and all medical records and available chest x-rays and/or pathology materials, as well as his expertise in the field, including experience and training, and his review of historical and more recent medical articles and journals.

Attached as Exhibit B, is the signed report and supplemental report of Dr. Zhang, Dr. Zhang's curriculum vitae and a list of other cases that Dr. Zhang has testified as an expert at trial or deposition in the last four years.

3.   Marty Kanarek

Marty S. Kanarek, Ph.D., Department of Population Health Sciences, Rm. 687 WARF, 610 Walnut Street, University of Wisconsin, Madison, WI 53726.   Marty Kanarek is Professor of Population Health Sciences and Environmental Studies. Dr. Kanarek is an expert in epidemiology, asbestos and the diseases caused by asbestos generally.   Dr. Kanarek's fee for deposition testimony is $450 per hour.   Dr. Kanarek has agreed to testify, if necessary, at trial.   Dr. Kanarek will be sufficiently familiar with the case to give a meaningful oral deposition.

Dr. Kanarek has expertise in the area of epidemiology, both generally and particularly related to asbestos exposure and exposure to asbestos-containing products. He also has expertise in the epidemiologic study of mesothelioma and other cancers in the human body.   He may be called to testify, either live or by deposition, based upon his general knowledge and review of the scientific and medical literature, concerning the incidence rate of mesothelioma among various occupations.   Dr. Kanarek may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases.

Dr. Kanarek may also testify that DeFord Cochran's increased risk of cancer was caused and/or contributed to by DeFord Cochran's exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' machinery

or equipment, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants.  Dr. Kanarek may testify that, based on epidemiological studies, DeFord Cochran's asbestos-related disease was caused by his exposure to Defendant's asbestos-containing products, or to asbestos-containing products manufactured by other entities, while working at Defendant's facilities. Dr. Kanarek may testify as to his review of the literature and the opinions and conclusions contained in that literature. Dr. Kanarek may testify that asbestos was known to cause various diseases and cancers before 1950.

Dr. Kanarek may testify that medical knowledge indicated in the 1920's that asbestos could be hazardous and deadly, and in the 1930's and 1940's indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames.

Dr. Kanarek may testify regarding exposure levels of asbestos, at what levels asbestos may cause disease, and as to when this was known in the medical and scientific literature.  Dr. Kanarek will discuss the dangers of 'low-dose' exposure to asbestos and will testify that risk for asbestos-related disease is substantially greater than ambient exposures.  Dr. Kanarek may testify concerning fiber types of asbestos generally and that all types of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers, including mesothelioma. Further, Dr. Kanarek may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer. Dr. Kanarek may specifically testify to activities listed in his curriculum vitae.

Dr. Kanarek may also testify concerning any studies or topics cited in any of his articles.

Dr. Kanarek may discuss the dangers of low-level exposure to asbestos, and may testify that there is no known safe level of exposure to asbestos. He may testify that all the various types of asbestos fibers are capable of causing death, mesothelioma, asbestosis and all other asbestos diseases. Dr. Kanarek may testify that pure chrysotile asbestos, in

the absence of tremolite, causes mesothelioma.

Attached as Exhibit C, is a signed report of Dr. Kanarek, Dr. Kanarek's curriculum vitae and a list of other cases that Dr. Kanarek has testified as an expert at trial or deposition in the last four years.

4.   Dr. Arnold Brody

Arnold R. Brody, Ph.D., 1 N. Ocean Blvd., Boca Raton, FL 33432. Dr. Brody is a specialist in lung biology and pathology. Dr. Brody's fee for deposition testimony is $625.00 per hour with a one-hour minimum. Dr. Brody has agreed to testify, if necessary, at trial; Dr. Brody will be sufficiently familiar with the case to provide a meaningful oral deposition.

Dr. Brody may testify as to the anatomy and associated asbestos-induced pathology of human and animal lungs, the causation and pathogenesis of asbestos-related disease and the deposition patterns of inhaled fibers and how this relates to asbestos exposure encountered in buildings and/or the work place. He will also testify regarding asbestos' effects on immune systems. Dr. Brody may testify as to the physiological design and function of the lungs, the effect of asbestos on the lungs and other parts of the body, and on the body's defense mechanisms. He may also testify about the irreversible effects of asbestos-related diseases and the prognosis for an asbestos-exposed individual. He may also testify concerning the scientific literature on the biological and toxicological effects of asbestos written by himself and others. He may also testify about the body's biologic responses to brief exposures to asbestos, the pathogenic effects produced by various asbestos fiber types, including chrysotile, and mechanisms of asbestos-induced diseases including fibrosis and carcinogenesis. He may further testify concerning asbestos deposition and migration in and through the lungs and body. He will discuss all types of cancer risks from asbestos exposure. He will define what "injury" means and that asbestos-related diseases are injuries.

Dr. Brody will testify there is no safe level of exposure to asbestos.

Dr. Brody may further testify as to facts and circumstances regarding the nature of

the injuries and damages that are the subject of this action.  He will testify that smoking is addictive.

Dr. Brody may testify based on hypotheticals propounded by counsel. Such hypotheticals may include, but are not limited to, factual summaries related to specific exposures for which there is evidence in the case.

Dr. Brody may testify as to the physiological design and function of the lungs, the effect of asbestos on the lungs and other parts of the body, and on the body's defense mechanisms. He may also testify about the irreversible effects of asbestos-related diseases and the prognosis for an asbestos-exposed individual. He may also testify concerning the scientific and medical literature on the biological and toxicological effects of asbestos written by him and others. He may testify regarding historical literature relating to asbestos related diseases, and when it was known and accepted in the medical and scientific community that asbestos could cause various diseases. He may also testify about the body's biologic responses to brief exposures to asbestos, the pathogenic effects produced by various asbestos fiber types, including chrysotile, and mechanisms of asbestos-induced diseases including fibrosis and

carcinogenesis. He may further testify concerning asbestos deposition and migration in and through the lungs and body. He will discuss all types of cancer risks from asbestos exposure, including mesothelioma. He will define what "injury" means and that asbestos-related diseases are injuries. Dr. Brody may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Brody may testify that all exposures to asbestos substantially above background or ambient levels contribute to the development of mesothelioma. He may testify that the effects of exposure to asbestos at occupational levels are cumulative in nature. Occupational levels of asbestos exposure to asbestos are typically many times (tens to hundreds or a thousand fold and greater) above background levels experienced by those with no exposure to asbestos at occupational levels. Occupational levels of asbestos exposure have been and can be experienced in non-occupational settings through

the use of various asbestos-containing consumer products. Dr. Brody may also testify that individuals can be exposed to asbestos outside of the workplace or in a bystander fashion, but still experience exposure at levels one would expect to see occupationally or directly. These exposures contribute to the development of asbestos diseases and particularly mesothelioma. Dr. Brody will testify that products which release asbestos fibers are unreasonably dangerous and that fibers will remain in the lungs until death. Dr. Brody may testify from hypothetical sets of facts and may give opinions regarding whether certain types of exposures would have substantially contributed to cause asbestos related disease, including mesothelioma. Dr. Brody may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos. He may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. He may testify regarding when it was known that bystander and household exposures were known to cause disease. He will testify that smoking is addictive. Dr. Brody's testimony is based on his review and knowledge of medical literature, his education and work experience, his research, and the research of others.

Dr. Brody may also testify that it has been known for decades that asbestos can cause asbestos related diseases, including mesothelioma.

Dr. Brody's opinions will be based upon his expertise in the field, including experience and training, and his review of historical and more recent medical and scientific articles and journals.

Dr. Brody will utilize teaching slides during his testimony. These slides have been produced to defendants in asbestos cases on numerous occasions and also included in his federal expert report produced in numerous cases, are available upon reasonable request.

Attached as Exhibit D, is the signed report of Dr. Brody, Dr. Brody's curriculum vitae and a list of other cases that Dr. Brody has testified as an expert at trial or deposition in the last four years.

5.      David Rosner

David Rosner, Ph.D., Co-Director, Center for the History & Ethics of Public Health Columbia University, 722 West 168th St., Suite 934, New York, NY 10032. Dr. David Rosner is an expert in the history of public health. Dr. Rosner holds a master of science in public health and a Ph.D. in the history of science from Harvard University. Dr. Rosner's background, experience, training, and qualifications are set forth in his curriculum vitae. Dr. Rosner's fee for deposition testimony is $400.00 per hour, with a minimum charge of four hours. Dr. Rosner has agreed to testify at trial; Dr. Rosner is or will be sufficiently familiar with the case to provide a meaningful oral deposition.

Dr. Rosner may testify as to their review of the literature and the opinions and conclusions contained in that literature. Dr. Rosner may testify that based on the medical and scientific literature available to Defendants, Defendants knew or should have known that their asbestos-containing products or the use of asbestos-containing products, could cause disease.

Dr. Rosner may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer. and that it was known or knowable that asbestos was hazardous and dangerous substance in those time frames.

Dr. Rosner may also testify that warnings placed on asbestos-containing products, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

Dr. Rosner may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases; the historical aspects of the development of OSHA/NIOSH and the history of OSHA/NIOSH regulations and other governmental regulations regarding asbestos and asbestos exposure.

He will also testify about when in the literature talc contaminated with asbestos was first reported. In addition, he may testify concerning cosmetic talc and trade organization involved with cosmetic talc.

He will also state that according to recognized warning practice, the defendants could have placed a warning on both the product and its containers, as well as taken other steps to alert DeFord Cochran as to the hazards of asbestos including but not limited to brochures, training manuals and posters.  For those defendants who allegedly placed a label on the product and/or the container or sent out brochures and other literature, he will evaluate those using commonly accepted warning principles.  He will testify that the prior OSHA label (i.e. 1972) was inadequate and was contrary to NIOSH's position and was inconsistent with other OSHA labels for substances which he understands pose a lesser health risk.

For those defendants whose products or activities involved the use of asbestos or the removal of asbestos and/or asbestos containing products, he will offer the opinion that an adequate warning should have been given relating to danger which results from the use of the defendant's product or an activity would result in exposure to asbestos even if the asbestos was not provided by the defendant.

For those defendants who are responsible for DeFord Cochran's exposure to asbestos, from either the workplace, home or the general environment, he will testify that the defendants did not follow proper and necessary warning steps to eliminate and/or minimize DeFord Cochran's asbestos exposure.

Dr. Rosner may also testify that warnings placed on asbestos-containing products, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

Further, Dr. Rosner will testify as to the following specific issues:   their background; ethical aspects of corporate responsibility; warnings; and the state of the art of the medical, scientific and/or technical literature regarding asbestos.  Dr. Rosner will testify regarding bystander exposure to asbestos, "fiber drift", the fact that asbestos products are "toxic" and unreasonably dangerous, the TLV defense, and the concept that each and every fiber exposure substantially contributed to and was a producing cause of

DeFord Cochran's asbestos-related disease. He will also testify concerning the AIA and its attempts to influence OSHA's warnings.

Dr. Rosner may testify as to their review of the literature and the opinions and conclusions contained in that literature. Dr. Rosner may also testify regarding availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. Dr. Rosner may also testify as to their review of the documents entered into evidence in this case or reviewed pertaining to Defendants, and as to their conclusions reached there from that Defendants were negligent, are strictly liable, and acted with wanton and willful disregard for the rights and safety of DeFord Cochran.

Additionally, Dr. Rosner may testify as to the hazardous nature of all types of asbestos and that all types of asbestos-containing products are unreasonably dangerous. He will also testify concerning any published article, book or his report and chronology to be produced upon request.

Attached as Exhibit E, is the signed report of Dr. Rosner, Dr. Rosner's curriculum vitae, list of articles and a list of other cases that Dr. Rosner has testified as an expert at trial or deposition in the last four years.

6.   <u>Gerald Markowitz</u>

Gerald Markowitz, Ph.D., Distinguished Professor of History John Jay College, 899 10th Ave., New York, NY 10019. Dr. Gerald Markowitz is an expert in the history of public health. Dr. Markowitz holds a master of arts in history and a Ph.D. in the history from the University of Wisconsin. Dr. Markowitz's background, experience, training, and qualifications are set forth in his curriculum vitae. Dr. Markowitz's fee for deposition testimony is $350.00 per hour. Dr. Markowitz has agreed to testify at trial; Dr. Markowitz is or will be sufficiently familiar with the case to provide a meaningful oral deposition.

Dr. Markowitz may testify as to their review of the literature and the opinions and conclusions contained in that literature. Dr. Markowitz may testify that based on the medical and scientific literature available to Defendants, Defendants knew or should have

known that their asbestos-containing products or the use of asbestos-containing products, could cause disease. In addition, that talc has been reported to contain some asbestos fibers.

Dr. Markowitz may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer. and that it was known or knowable that asbestos was hazardous and dangerous substance in those time frames.

Dr. Markowitz may also testify that warnings placed on asbestos-containing products, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

Dr. Markowitz may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases; the historical aspects of the development of OSHA/NIOSH and the history of OSHA/NIOSH regulations and other governmental regulations regarding asbestos and asbestos exposure.

He will also testify about when in the literature talc contaminated with asbestos was first reported. In addition, he may testify concerning cosmetic talc and trade organization involved with cosmetic talc.

He will also state that according to recognized warning practice, the defendants could have placed a warning on both the product and its containers, as well as taken other steps to alert DeFord Cochran as to the hazards of asbestos including but not limited to brochures, training manuals and posters. For those defendants who allegedly placed a label on the product and/or the container or sent out brochures and other literature, he will evaluate those using commonly accepted warning principles. He will testify that the prior OSHA label (i.e. 1972) was inadequate and was contrary to NIOSH's position and was inconsistent with other OSHA labels for substances which he understands pose a lesser health risk.

For those defendants whose products or activities involved the use of asbestos or the removal of asbestos and/or asbestos containing products, he will offer the opinion that an adequate warning should have been given relating to danger which results from the use of the defendant's product or an activity would result in exposure to asbestos even if the asbestos was not provided by the defendant.

For those defendants who are responsible for DeFord Cochran's exposure to asbestos, from either the workplace, home or the general environment, he will testify that the defendants did not follow proper and necessary warning steps to eliminate and/or minimize DeFord Cochran's asbestos exposure.

Dr. Markowitz may also testify that warnings placed on asbestos-containing products, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

Further, Dr. Markowitz will testify as to the following specific issues:   their background; ethical aspects of corporate responsibility; warnings; and the state of the art of the medical, scientific and/or technical literature regarding asbestos.  Dr. Markowitz will testify regarding bystander exposure to asbestos, "fiber drift", the fact that asbestos products are "toxic" and unreasonably dangerous, the TLV defense, and the concept that each and every fiber exposure substantially contributed to and was a producing cause of DeFord Cochran's asbestos-related disease. He will also testify concerning the AIA and its attempts to influence OSHA's warnings.

Dr. Markowitz may testify as to their review of the literature and the opinions and conclusions contained in that literature.  Dr. Markowitz may also testify regarding availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature.  Dr. Markowitz may also testify as to their review of the documents entered into evidence in this case or reviewed pertaining to Defendants, and as to their conclusions reached there from that Defendants were negligent, are strictly liable, and acted with wanton and willful disregard for the rights and safety of DeFord Cochran.

Additionally, Dr. Markowitz may testify as to the hazardous nature of all types of asbestos and that all types of asbestos-containing products are unreasonably dangerous. He will also testify concerning any published article, book or his report and chronology to be produced upon request.

Attached as Exhibit F, is the signed report of Dr. Markowitz, Dr. Markowitz's curriculum vitae, list of articles and a list of other cases that Dr. Markowitz has testified as an expert at trial or deposition in the last four years.

7.   James Millette

James Millette, Millette Technical Consulting, 220 Cricket Walk SW, Lilburn, GA 30047.  Dr. Millette is a consulting scientist involved in environmental/forensic/particle and materials studies since 1972 primarily using microscopy techniques. Dr. Millette is a scientist specializing in the measurement and analysis of materials and determining the constituent ingredients in materials, and characterizing those materials and ingredients. Dr. Millette is also an experienced electron microscopist who specializes in experimental pathology. Dr. Millette has examined and tested various asbestos products.

Dr. Millette may testify about his experience in the field of microscopy, his published papers, and presentations at various national and international meetings/conferences.

Dr. Millette may testify regarding the mechanics of fiber burden analysis and his results and observations regarding any such testing.  He may also testify regarding the pathology materials, materials-testing techniques, air sampling techniques, fiber counting techniques, physical characteristics of asbestos and other minerals, identification of asbestos and materials and other constituents, methods for analyzing asbestos materials, releasability of asbestos fibers, and his opinion of the releasability of asbestos fibers from asbestos-containing products.  He may also testify generally as to the characteristics and disease-causing capabilities of the various types of asbestos fibers.  Dr. Millette may also testify concerning the results of any fiber burden analysis performed on the pathology tissue of DeFord Cochran.  Such testimony may be based on the destructive testing and

analysis performed by any defense expert and/or the results of his own destructive testing, if any, on DeFord Cochran's pathology materials.   His testimony is based on his review of literature, his education and work experience, and his own research.

His testimony may involve the videotaped presentation of the electron microscopy procedure employed by him in his research and in the evaluation of specific laboratory specimens.  He may also testify concerning the pathogenicity and carcinogenicity of the various types of asbestos fibers. He may also testify that DeFord Cochran developed an asbestos related mesothelioma, which caused his death.

Dr. Millette may testify on his results from the release of asbestos-containing dust from the various products that he has tested by either mixing, application, removal or the normal use of those products.  Dr. Millette has quantified the asbestos release generated from the aforementioned uses of these materials.  Dr. Millette may testify regarding the general background levels of asbestos release, bystander levels of exposure of the fiber release, air samples in the personal breathing zone generated from the fiber release and fiber release and contamination on clothing and other personal contamination.  He may compare his results of these dust studies by analysis using both particles per cubic foot, fibers per cc as well as current and past techniques used to analyze asbestos content in dust.  Dr.Millette may testify that the levels of asbestos dust measured during these tests exceeded established TLV's and PEL's in many instances.

He will also state that according to recognized warning practice, the defendants could have placed a warning on both the product and its containers, as well as taken other steps to alert DeFord Cochran as to the hazards of asbestos including but not limited to brochures, training manuals and posters.  For those defendants who allegedly placed a label on the product and/or the container or sent out brochures and other literature, he will evaluate those using commonly accepted warning principles.  He will testify that the prior OSHA label (i.e. 1972) was inadequate and was contrary to NIOSH's position and was inconsistent with other OSHA labels for substances which he understands pose a lesser health risk.

For those defendants whose products or activities involved the use of asbestos or the removal of asbestos and/or asbestos containing products, he will offer the opinion that an adequate warning should have been given relating to danger which results from the use of the defendant's product or an activity would result in exposure to asbestos even if the asbestos was not provided by the defendant.

For those defendants who are responsible for DeFord Cochran's exposure to asbestos, from either the workplace, home or the general environment, he will testify that the defendants did not follow proper and necessary warning steps to eliminate and/or minimize DeFord Cochran's asbestos exposure.

This expert may testify regarding the general background levels of asbestos release, bystander levels of exposure of the fiber release, and fiber release and contamination on clothing and other personal contamination.  He may also testify regarding results of dust studies by analysis of using both particles per cubic foot and fibers per cubic centimeter, as well as current and past techniques used to analyze asbestos content in dust.  He may testify that the levels of asbestos dust to which DeFord Cochran was exposed during his working career would have likely exceeded established TLVs and PELs in many instances.

This expert may also testify concerning asbestos reintrainment that occurs, the studies of the amount of asbestos fibers released into the breathing zone during ordinary and foreseeable operations of asbestos products.  He may testify that during foreseeable uses of Defendants' asbestos products that those products released asbestos fibers into the breathing zone of workers, including but not limited to, DeFord Cochran, in levels that are above background.  These asbestos products include dry powders that are mixed with water and sanded, pre-mixed pastes that are sanded, thermal insulation products that are cut, sawed and/or torn out, adhered gaskets that are removed in whole or in part by brushing or sanding, boards or flat sheets or tiles or siding that are cut or scored or abraded, brake linings that are ground, filed or sanded and/or blown out of drums with supplied air, and products scrap that is swept or blown or vacuumed or ripped out.  He

may testify that impregnated and/or encapsulated products, when disturbed or abraded, can release asbestos fibers into the breathing zone of workers, like DeFord Cochran, in levels that are above background.  He may compare and contrast the findings with other scientific findings.  He may offer opinions concerning testing which has been performed on behalf of Defendants or the lack of testing on Defendants' products.

This expert may testify that dust levels measured in testing one Defendants' asbestos product would be similar to the results from another Defendant's similar product with similar ingredients.

He may testify that asbestos exposure of DeFord Cochran arising from Defendants' asbestos products or activities involving the use of asbestos or asbestos products were substantial contributing factors in DeFord Cochran's overall asbestos exposure and were the result of Defendant's failure to exercise appropriate industrial hygiene controls for suppressing or reducing exposures to asbestos, including but not limited to adequately warning DeFord Cochran of the dangers associated with asbestos and means to protect himself.   He will testify that these failures by Defendants were knowing and/or unreasonable in the time and place in which they occurred given the information that was available to Defendants, medical and scientific literature, statutes, regulations and/or based on the Defendant's actual knowledge.  This expert's opinions may be based upon their review of any and all records and materials, published and or expressed opinions of other experts in the field, corporate documents, as well as their expertise in the field, including experience and training, and their review of historical and more recent scientific articles and journals as well as government regulations.

Dr. Millette may testify based on hypotheticals propounded by counsel. Such hypotheticals may include, but are not limited to, factual summaries related to specific exposures for which there is evidence in the case.

Dr. Millette's fee for deposition will be provided prior to his deposition. Dr. Millette has agreed to testify, if necessary, at trial and will be sufficiently familiar with the case to provide a meaningful live or telephonic deposition.

Attached as Exhibit G, are the reports, including his own testing, and studies of Dr. Millette that he may testify to in this case, as well as Dr. Millette's curriculum vitae and a list of other cases that Dr. Millette has testified as an expert at trial or deposition in the last four years.

8.   <u>Barry Horn</u>

Barry Horn, M.D., 623 Cross Ridge Terrace, Orinda, California 94563.  Dr. Horn is a specialist in pulmonary medicine.  Dr. Horn's fee for deposition testimony is $600 per hour with a one-hour minimum.  Dr. Horn has agreed to testify, if necessary, at trial; Dr. Horn is or will be sufficiently familiar with the case to provide a meaningful oral deposition.

Dr. Horn may testify, live or by deposition, concerning his review of DeFord Cochran's work history, medical records, x rays, and bills for medical services, as well as his diagnosis of asbestos-related disease in this case.  He may testify concerning asbestos, the effects of asbestos on the body, and any other topics related thereto.  Dr. Horn may testify as to general lung anatomy, the physiological design and function of the lungs, the effect of asbestos on the lungs, and on the body's defense mechanisms. Additionally, he may testify concerning DeFord Cochran's increased risk of mesothelioma as a consequence of his exposure to asbestos.  Dr. Horn may also testify that DeFord Cochran's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products.  He may also testify that DeFord Cochran incurred medical expenses as a result of his exposure to asbestos and his development of an asbestos-related disease.  He may also testify concerning the reasonable and necessary medical expenses that DeFord Cochran incurred as a result of his asbestos-related disease.

Dr. Horn may also testify as to his opinions and conclusions regarding DeFord Cochran's medical condition, including based on his reviews of DeFord Cochran's x rays and other diagnostic films.

Dr. Horn may also testify that DeFord Cochran's diagnosis of mesothelioma is related to, and caused by his direct exposure to asbestos, (including minimal amounts of

asbestos) and that each and every exposure contributes to asbestos-related disease.

Additionally, Dr. Horn will testify about asbestos and the diseases caused by asbestos generally.  He will testify that smoking is addictive.  Dr. Horn may testify that, based on epidemiological studies, DeFord Cochran's asbestos-related disease was caused by his exposure to asbestos-containing products.  Additionally, Dr. Horn may testify that, based on the medical and scientific literature available to defendants, defendants knew or should have known that their asbestos-containing products could cause disease.  He may testify as to his review of the literature.  Dr. Horn may further testify regarding exposure level of asbestos and what levels of asbestos may cause disease, and as to when this was known in the medical and scientific literature. Dr. Horn will testify that each identified exposure to asbestos is a contributing cause to asbestos-related diseases.  Dr. Horn will testify as to when end product users, household-exposed individuals and bystanders developed asbestos-related diseases, including resulting mortality.  Dr. Horn may also testify as to his review of the documents entered into evidence in this case or reviewed pertaining to Defendants, including product-specific documents, and as to his conclusions reached there from.

Dr. Horn may also testify as to the hazardous nature of asbestos and that asbestos-containing products are unreasonably dangerous due to their propensity to cause asbestos-related diseases.  Dr. Horn may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer.  Dr. Horn may also testify concerning fiber types of asbestos generally and that all types of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers.  Dr. Horn may further testify that medical articles and journals indicated in the 1920's that asbestos could be hazardous and deadly, and in the 1930's and 1940's indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames. He may also testify that warnings placed on containers of asbestos containing products, if any, may have been inadequate to properly inform users and persons exposures of the significant

hazards of asbestos inhalation.

Further, Dr. Horn will testify as to the following specific issues: his background; ethical aspects of hazard communication; warnings; and the state of the art of the medical and scientific literature regarding asbestos.  Dr. Horn will testify regarding bystander exposure to asbestos, "fiber drift", the fact that asbestos products are "toxic" and unreasonably dangerous, TLV's and PEL's, and the concept that each identified exposure was a proximate and substantial factor in causing DeFord Cochran's asbestos-related disease.  Further, Dr. Horn may testify as to the degree of asbestos exposure DeFord Cochran would have received during his employment. He may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos.

Dr. Horn may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases; the historical aspects of the development of OSHA/NIOSH and the history of OSHA/NIOSH regulations and other governmental regulations regarding asbestos and asbestos exposure.  Dr. Horn may also testify that Defendants' failure to comply with these regulations resulted in asbestos exposures leading to DeFord Cochran's injuries.

This doctor may testify that, based on a review of published information and unpublished data concerning the defendants' products, these products produce dangerous levels of asbestos dust, which contributed to cause DeFord Cochran's disease. Dr. Horn may further discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos.

Dr. Horn may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma.  Dr. Horn may also testify that chrysotile in asbestos-containing products may be contaminated with tremolite asbestos.

He will also state that according to recognized warning practice, the defendants could have placed a warning on both the product and its containers, as well as taken other

steps to alert DeFord Cochran as to the hazards of asbestos including but not limited to brochures, training manuals and posters.  For those defendants who allegedly placed a label on the product and/or the container or sent out brochures and other literature, he will evaluate those using commonly accepted warning principles.  He will testify that the prior OSHA label (i.e. 1972) was inadequate and was contrary to NIOSH's position and was inconsistent with other OSHA labels for substances which he understands pose a lesser health risk.

For those defendants whose products or activities involved the use of asbestos or the removal of asbestos and/or asbestos containing products, he will offer the opinion that an adequate warning should have been given relating to danger which results from the use of the defendant's product or an activity would result in exposure to asbestos even if the asbestos was not provided by the defendant.

For those defendants who are responsible for DeFord Cochran's exposure to asbestos, from either the workplace, home or the general environment, he will testify that the defendants did not follow proper and necessary warning steps to eliminate and/or minimize DeFord Cochran's asbestos exposure.

This expert may testify regarding the general background levels of asbestos release, bystander levels of exposure of the fiber release, and fiber release and contamination on clothing and other personal contamination.  He may also testify regarding results of dust studies by analysis of using both particles per cubic foot and fibers per cubic centimeter, as well as current and past techniques used to analyze asbestos content in dust.  He may testify that the levels of asbestos dust to which DeFord Cochran was exposed during his working career would have likely exceeded established TLVs and PELs in many instances.

This expert may also testify concerning asbestos reintrainment that occurs, the studies of the amount of asbestos fibers released into the breathing zone during ordinary and foreseeable operations of asbestos products.  He may testify that during foreseeable uses of Defendants' asbestos products that those products released asbestos fibers into the

breathing zone of workers, including but not limited to, DeFord Cochran, in levels that are above background.  These asbestos products include dry powders that are mixed with water and sanded, pre-mixed pastes that are sanded, thermal insulation products that are cut, sawed and/or torn out, adhered gaskets that are removed in whole or in part by brushing or sanding, boards or flat sheets or tiles or siding that are cut or scored or abraded, brake linings that are ground, filed or sanded and/or blown out of drums with supplied air, and products scrap that is swept or blown or vacuumed or ripped out.  He may testify that impregnated and/or encapsulated products, when disturbed or abraded, can release asbestos fibers into the breathing zone of workers, like DeFord Cochran, in levels that are above background.  He may compare and contrast the findings with other scientific findings.  He may offer opinions concerning testing which has been performed on behalf of Defendants or the lack of testing on Defendants' products.

This expert may testify that dust levels measured in testing one Defendants' asbestos product would be similar to the results from another Defendant's similar product with similar ingredients.

It is anticipated, that these experts will testify that asbestos exposure of DeFord Cochran arising from Defendants' asbestos products or activities involving the use of asbestos or asbestos products were substantial contributing factors in DeFord Cochran's overall asbestos exposure and were the result of Defendant's failure to exercise appropriate industrial hygiene controls for suppressing or reducing exposures to asbestos, including but not limited to adequately warning DeFord Cochran of the dangers associated with asbestos and means to protect himself.  He will testify that these failures by Defendants were knowing and/or unreasonable in the time and place in which they occurred given the information that was available to Defendants, medical and scientific literature, statutes, regulations and/or based on the Defendant's actual knowledge.  This expert's opinions may be based upon their review of any and all records and materials, published and or expressed opinions of other experts in the field, corporate documents, as well as their expertise in the field, including experience and training, and their review

of historical and more recent scientific articles and journals as well as government regulations.

Dr. Horn may testify based on hypotheticals propounded by counsel. Such hypotheticals may include, but are not limited to, factual summaries related to specific exposures for which there is evidence in the case.

Dr. Horn's opinions will be based upon his review of any and all medical records and available x rays and/or pathology materials and reports, as well as his expertise in the field, including experience and training, and his review of historical and more recent medical articles and journals.  This doctor may testify that, based on a review of published information and unpublished data concerning the Defendants' products, these products produce dangerous levels of asbestos dust that contributed to cause DeFord Cochran's disease.

Defense counsel is in possession of numerous transcripts of the testimony of this expert within which the opinions he has expressed on these subjects have been fully explored.

Attached as Exhibit H, is Dr. Horn's curriculum vitae and a list of other cases that Dr. Horn has testified as an expert at trial or deposition in the last four years. Dr. Horn's report will be served on all counsel at a later date.

## **PLAINTIFFS' RULE 26(a)(2)(C) EXPERT DISCLOSURES**

Plaintiffs disclose the following fact witnesses listed below in the above captioned matter pursuant to Federal Rule 26(a)(2)(C).

Pursuant to Federal Rule 26(e), Plaintiffs will supplement this disclosure to the extent necessary and in the event additional information is obtained during the pendency of:

9.    Dr. Jed Gorden

Jed Gorden, M.D. for the Swedish Cancer Institute Thoracic Surgery First Hill, 1101 Madison St., Suite 900, Seattle, WA 98104. Dr. Gorden is expected to testify at the

trial of this matter and will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the specific testimony, including any opinion on its basis, that he is expected to testify to at trial.

The opinions and observations are based on Dr. Gorden's own personal knowledge, education, training and experience, as well as his examination of DeFord Cochran's pathology reports, CT, PET-CT and other chest films, and medical records pertaining to the diagnosis and treatment of malignant mesothelioma. Dr. Gorden's opinions are stated within a reasonable degree of medical certainty.

Dr. Gorden may testify that mesothelioma is an aggressive tumor which progresses rapidly. There is no cure. The therapeutic options are limited but include trimodality treatment with radical pleurectomy and decortication, radiation and chemotherapy. No matter how aggressive, surgery cannot provide a better oncologic result than an R1 resection, or resection with microscopic residual disease. The malignant mesothelioma cells cannot be completely surgically removed. Such surgical results are almost never accepted with other solid tumors. In time, there will almost always be recurrences, the speed of which is influenced by the cell type or histology, staging, and the surgical expertise. The most essential part in the success is early detection of recurrence and planned ablation.

Dr. Gorden may testify as to the nature, causes, treatments, and prognosis of mesothelioma and other asbestos-related conditions of DeFord Cochran.

Dr. Gorden is a non-retained expert and one of DeFord Cochran's treating physicians, the details of which are reflected in medical records previously obtained by Defendants. Dr. Gorden is both a fact witness in the case as well as a testifying expert on the nature, causes, treatments, and prognosis of the mesothelioma and other asbestos-related conditions of DeFord Cochran.

Dr. Gorden may testify about the diagnosis and treatment of DeFord Cochran, including but not limited to the DeFord Cochran's general medical history, and specific details about the DeFord Cochran's medical evaluation, treatment, prognosis, potential

future treatment(s), as well as the reasonable and medically necessary costs of the DeFord Cochran's treatment for malignant mesothelioma.

Dr. Gorden's testimony may include opinions based on his review of the medical records or the treatment of DeFord Cochran in addition to facts and information acquired through his training, skill, and extensive experience treating patients with mesothelioma and researching mesothelioma as a disease, including but not necessarily limited to: 1) the diagnosis of DeFord Cochran's disease(s), 2) the cause(s) of DeFord Cochran's disease, 3) whether asbestos was a substantial contributing cause of DeFord Cochran's mesothelioma, 4) the human body's biological response to asbestos fibers, 5) the specific fiber types of asbestos which cause mesothelioma, 6) the histological mesothelioma subtypes which are caused by exposure to asbestos, 7) the concept of latency as it pertains to exposure to asbestos and the diagnosis of mesothelioma, 8) whether any exposure to asbestos above background level occurring within the applicable latency period is a substantial contributing cause of mesothelioma, 9) the curability of mesothelioma, 10) strategies for preventing mesothelioma, and 11) the known and purported causes of malignant mesothelioma.

Dr. Gorden may testify that there is no safe level of exposure to asbestos in terms of causation of mesothelioma. She may testify as to whether DeFord Cochran had any biomarkers of asbestos exposure, including pleural plaques or asbestosis, and the significance of those findings. She may also testify that DeFord Cochran was or may have been exposed to asbestos that was present in one or more defendant's products and whether those exposures substantially contributed to cause DeFord Cochran's mesothelioma. She may also testify by means of hypotheticals relating to the facts and circumstances of the DeFord Cochran's exposure and whether such exposure would have substantially contributed to causing the DeFord Cochran's mesothelioma.

10. <u>Dr. Shalini Nair</u>

Shalini Nair, M.D., for the Swedish Critical Care Medicine, 500 17th Ave, Seattle, WA 98122. Dr. Nair is expected to testify at the trial of this matter and will be sufficiently

familiar with the pending action to submit to a meaningful oral deposition concerning the specific testimony, including any opinion on its basis, that she is expected to testify to at trial.

The opinions and observations are based on Dr. Nair's own personal knowledge, education, training and experience, as well as her examination of DeFord Cochran's pathology reports, CT, PET-CT and other chest films, and medical records pertaining to the diagnosis and treatment of malignant mesothelioma. Dr. Nair's opinions are stated within a reasonable degree of medical certainty.

Dr. Nair may testify that mesothelioma is an aggressive tumor which progresses rapidly. There is no cure. The therapeutic options are limited but include trimodality treatment with radical pleurectomy and decortication, radiation and chemotherapy. No matter how aggressive, surgery cannot provide a better oncologic result than an R1 resection, or resection with microscopic residual disease. The malignant mesothelioma cells cannot be completely surgically removed. Such surgical results are almost never accepted with other solid tumors. In time, there will almost always be recurrences, the speed of which is influenced by the cell type or histology, staging, and the surgical expertise. The most essential part in the success is early detection of recurrence and planned ablation.

Dr. Nair may testify as to the nature, causes, treatments, and prognosis of mesothelioma and other asbestos-related conditions of DeFord Cochran.

Dr. Nair is a non-retained expert and one of DeFord Cochran's treating physicians, the details of which are reflected in medical records previously obtained by Defendants. Dr. Nair is both a fact witness in the case as well as a testifying expert on the nature, causes, treatments, and prognosis of the mesothelioma and other asbestos-related conditions of DeFord Cochran.

Dr. Nair may testify about the diagnosis and treatment of DeFord Cochran, including but not limited to the DeFord Cochran's general medical history, and specific details about the DeFord Cochran's medical evaluation, treatment, prognosis, potential

future treatment(s), as well as the reasonable and medically necessary costs of the DeFord Cochran's treatment for malignant mesothelioma.

Dr. Nair's testimony may include opinions based on her review of the medical records or the treatment of DeFord Cochran in addition to facts and information acquired through her training, skill, and extensive experience treating patients with mesothelioma and researching mesothelioma as a disease, including but not necessarily limited to: 1) the diagnosis of DeFord Cochran's disease(s), 2) the cause(s) of DeFord Cochran's disease, 3) whether asbestos was a substantial contributing cause of DeFord Cochran's mesothelioma, 4) the human body's biological response to asbestos fibers, 5) the specific fiber types of asbestos which cause mesothelioma, 6) the histological mesothelioma subtypes which are caused by exposure to asbestos, 7) the concept of latency as it pertains to exposure to asbestos and the diagnosis of mesothelioma, 8) whether any exposure to asbestos above background level occurring within the applicable latency period is a substantial contributing cause of mesothelioma, 9) the curability of mesothelioma, 10) strategies for preventing mesothelioma, and 11) the known and purported causes of malignant mesothelioma.

Dr. Nair may testify that there is no safe level of exposure to asbestos in terms of causation of mesothelioma. She may testify as to whether DeFord Cochran had any biomarkers of asbestos exposure, including pleural plaques or asbestosis, and the significance of those findings. She may also testify that DeFord Cochran was or may have been exposed to asbestos that was present in one or more defendant's products and whether those exposures substantially contributed to cause DeFord Cochran's mesothelioma. She may also testify by means of hypotheticals relating to the facts and circumstances of the DeFord Cochran's exposure and whether such exposure would have substantially contributed to causing the DeFord Cochran's mesothelioma.

DATED: March 1, 2023                                    FROST LAW FIRM, PC

                                                        By:____/s/ Andrew Seitz____
                                                        ANDREW SEITZ
                                                        Attorneys for Plaintiffs

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                                              )
COUNTY OF LOS ANGELES )

I, Kimberly Manalansan, declare as follows:

I am over eighteen years of age and not a party to the within action; my business address is 273 West 7th Street, San Pedro, California 90731.  I am employed in Los Angeles County, California.

On March 1, 2023, I served the following document(s) in the following manner(s):

## PLAINTIFFS' EXPERT DISCLOSURES PURSUANT TO F.R.C.P. RULE 26

on the following:

## ALL COUNSEL OF RECORD

☒     (By CM/ECF) By transmitting electronically via CM/ECF the document(s) listed above as set forth on the electronic service list on this date before 11:59 p.m.

☒     (Federal)  I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on March 1, 2023, at San Pedro, California.

/s/ *Kimberly Manalansan*
An Employee of Frost Law Firm, PC